

DEC 3 0 2013

CLERK, U.S. DISTRICT COURT
RICHMOND, VA

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

UNITED STATES OF AMERICA

v.                                    Criminal Action No. 3:13cr134

ZWEDE SMITH

## MEMORANDUM OPINION

This matter is before the Court on Defendant Zwede Smith's ("Defendant" or "Smith") MOTION TO SUPPRESS EVIDENCE. (Docket No. 15). For the reasons set forth below, the motion has been denied.[1]

## FACTUAL BACKGROUND

On April 8, 2013, at approximately 12 a.m., Richmond detectives Paul Jenkins and Elmer Fernendez were conducting an interdiction at the Apex bus station in the area of 910 North Boulevard. The interdiction operations conducted at Richmond's bus and train stations and the role that those activities play in efforts to control trafficking in drugs and guns are the subject of many decisions issued by this Court. See, e.g., United States v. Jackson, 1998 U.S. App. LEXIS 13189 (4th Cir. Va. June 19, 1998)(upholding this Court's denial of a motion to suppress triggered by Richmond's drug interdiction activities at

---

[1] By Order entered November 21, 2013 (Docket No. 25), the MOTION TO SUPPRESS EVIDENCE was denied.

Richmond's train station); United States v. Howie, 1999 U.S. App. LEXIS 858 (4th Cir. Va. Jan. 22, 1999)(upholding a conviction for drug possession based on a Richmond interdiction team's activities at the Richmond Greyhound Station); United States v. Salas, 1998 U.S. App. LEXIS 32633 (4th Cir. Va. Dec. 31, 1998) (affirming a conviction for drug possession and distribution resulting from the Richmond interdiction team's search at a Richmond bus station). Richmond's transit centers, while certainly serving a legitimate and useful purpose, have been frequently abused by criminals who wish to transport contraband and avoid interdiction targets in other major cities. See, e.g., United States v. Zenon, 2012 U.S. Dist. LEXIS 158507, *1 (E.D. Va. Nov. 2, 2012)(mentioning a defendant who told police that it was necessary to travel by air from Texas to Maryland via Richmond's airport, stopping in Richmond to rent a car for the remainder of the trip in order to avoid law enforcement interdiction efforts in Washington, D.C. and Baltimore, Maryland). The purpose of these interdiction operations is to deter those who use public conveyances as a means to traffic in guns and drugs.

Jenkins testified that his unit is assigned to discharge interdiction duties at the bus station approximately two times per week with a view to intercepting people bringing illegal items into and out of Richmond by way of interstate buses.

According to Jenkins, it was "very common" for people to be transporting illegal items, such as guns and drugs, on this bus line.

While on this interdiction assignment, Jenkins spotted Zwede Smith inside the Apex bus station in Richmond.[2] Jenkins recognized Smith from a gang investigation that was conducted in 2007. During that investigation, Jenkins had recovered information from another individual's computer pursuant to a search warrant. The seized computer data included a video file which showed Smith passing a handgun to a small child. Additionally, Jenkins recalled having been recently informed by another detective that Smith was a suspect in two homicides, both of which had involved firearms. At the time Jenkins spotted Smith in the bus station, he knew that Smith had been convicted of an "eluding charge," but stated that he did not think that Smith had incurred any firearms convictions, gang-related convictions, or any convictions for violent offenses.

Jenkins testified that Smith "kind of seemed anxious" because he was looking around and moving around inside the bus

---

[2] It is unclear how long the detectives observed Smith before approaching him. Jenkins testified that it may have been 30-60 minutes, and Fernendez testified that it may have been 5-6 minutes. Clearly there is a discrepancy between the testimony of the officers; however, it appears that the officers were not watching the station at exactly the same times. In any event, the discrepancy is not relevant to the issue raised by the motion.

station while most of the other passengers were sitting down or leaning against the walls. Jenkins and Fernendez saw Smith exit the bus station and line up at the door of a waiting bus. The bus had not yet started to board, and Smith was first in line to board it.

Upon approaching Smith, Jenkins showed Smith his police badge. Both detectives were in plainclothes. Jenkins introduced himself as "Detective Jenkins" and asked Smith his name. Smith stated "Zwede Smith, do you want my ID?" As Smith was reaching to pull out his ID, Jenkins said "No, sir, I already know who you are." Jenkins then asked if he could speak with Smith, a request to which Smith consented. Next, Jenkins asked Smith if they could "walk a little bit so that, you know, we're not around this whole crowd" to which Smith replied "okay." The detectives and Smith then walked toward the rear of the bus. The detectives never touched Smith during this time.

At the rear of the bus, the three men stopped and stood in a triangular formation. Smith, whose back was toward the bus, was at the apex, and the detectives, who were facing Smith, were at each foot of the triangle. The officers were approximately an arm's length distant from Smith. Jenkins then asked Smith if he had "anything illegal on [him] or [his] person," to which Smith replied "no." Jenkins then asked if Fernendez could search Smith's bag. Smith replied "sure," but just as Smith began to

4

remove the bag from his left shoulder, he ran away from the
officers, taking the bag with him as he fled in a "full-on run."
In his flight, Smith ran across all four lanes of North
Boulevard, through oncoming automobile traffic, and around a
pile of mulch. He then re-crossed the four lanes of traffic,
returning to the same side of the street from whence his flight
had begun. Both detectives pursued Smith on foot as he led them
across the street and back. Jenkins lost sight of Fernendez and
Smith for "[m]aybe a couple seconds," but regained sight of both
as Fernendez was placing Smith in handcuffs.

Fernendez testified that he placed Smith in handcuffs for
safety reasons because he did not know at that time what was in
Smith's bag. When Jenkins approached the scene, Smith was lying
face down on the sidewalk and his backpack lay "within a couple
feet" from Smith.

As other officers arrived on the scene, Fernendez and
Jenkins were speaking with the other officers. After some
discussion about whether they could search Smith's bag, the
officers concluded that they still had Smith's consent to
search. Thus, the officers did not ask Smith again whether they
could search his bag. The bag was searched within approximately
three minutes of Smith's apprehension.[3] Inside the bag, officers

---

[3] The subjective beliefs of the officers are not relevant. See
Whren v. United States, 517 U.S. 806, 813 (1996)(holding that

5

found a black ski mask, a .38 revolver, and some ammunition. Smith did not make any statements about the bag, and did not answer Fernendez's questions about whether the bag belonged to him. However, did say: "my life is over," "why are you doing this to me," and "I can't believe Detective Jenkins recognized me." Smith was arrested[4] and charged with being a convicted felon in possession of a firearm in violation of 18 U.S.C. § 922(g).

## LEGAL STANDARDS

The Fourth Amendment to the United States Constitution guarantees that "people are to be secure in their persons . . . against unreasonable searches and seizures." U.S. Const. Amend. IV; see also Wolf v. Colorado, 338 U.S. 25, 27-28 (1949) (holding that the Fourth Amendment is incorporated by the Fourteenth Amendment, and therefore applies to both state and federal government actors). Evidence that is collected by law

---

"[s]ubjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis."); see also Scott v. United States, 436 U.S. 128, 138 (U.S. 1978) (holding "the fact that the officer does not have the state of mind which is hypothecated by the reasons which provide the legal justification for the officer's action does not invalidate the action taken as long as the circumstances, viewed objectively, justify that action.").

[4] Smith was not arrested for his conduct during the flight when he twice ran across a four-lane street on which traffic was moving even though that conduct was a misdemeanor committed in the presence of the officers. That is because, under Virginia law, such conduct cannot be the basis for an arrest. Instead, the offender must be issued a summons. See pp. 22-23, infra.

enforcement in violation of the Fourth Amendment will be excluded from use at trial. See Mapp v. Ohio, 367 U.S. 643, 651-57 (1961); see also Wong Sun v. United States, 371 U.S. 471, 488 (1963) (noting that if evidence is obtained during a violation of the suspect's Fourth Amendment rights (i.e. an "exploitation of that illegality"), then that evidence is a "fruit of the poisonous tree" and may not be used against that defendant) (internal citations omitted).

## ANALYSIS

### 1. The Asserted "Terry Stop"

The United States contends that the facts constitute a lawful investigative stop within the meaning of Terry v. Ohio, 392 U.S. 1 (1968). Under Terry, a law enforcement officer who has a reasonable suspicion, based on articulable facts, that an individual is engaged in criminal activity, may detain that individual for investigatory purposes. Terry v. Ohio, 392 U.S. at 21-22; see also Illinois v. Wardlow, 528 U.S. 119, 124 (2000); United States v. Sharpe, 470 U.S. 675, 682 (1985). Of course, to justify a Terry stop, the government "'must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion.'" United States v. McBride, 676 F.3d 385, 391 (4th Cir. 2012) (quoting Terry, 392 U.S. at 21). This suspicion

must be based on more than an officer's hunch, but reasonable suspicion is less than probable cause. United States v. Arvizu, 534 U.S. 266, 274 (2002); Terry, 392 U.S. at 27. And, because the intrusion created by an investigatory stop is minimal, the reasonable suspicion standard is set fairly low. See United States v. Glover, 662 F.3d 694, 698-700 (4th Cir. 2011) (finding reasonable suspicion to justify a stop and frisk when police saw a man watching and then approaching a gas station employee at 4:40 a.m. in an area known for its high crime); United States v. McCoy, 513 F.3d 405, 412-13 (4th Cir. 2008) (finding reasonable suspicion to stop a vehicle (Vehicle A) after police observed another vehicle (Vehicle B) parked in an area where officers knew drugs to be sold, and saw a man get out of Vehicle B and into Vehicle A, which sped away as officers approached).

Determining whether there was reasonable suspicion to detain a suspect must be made by considering "the totality of the circumstances." Arvizu, 534 U.S. at 273. The determination requires a flexibility that "allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'" Id. (quoting United States v. Cortez, 449 U.S. 411, 418 (1981)). We "consider [these inferences] in their totality, not piecemeal and in isolation." United States v. Darden, 149 F.3d 1171, 1998

U.S. Dist. LEXIS 12728, at *15 (4th Cir. June 16, 1998) (unpublished opinion). We must "'give due weight to inferences drawn from those [circumstances] by . . . local law enforcement officers.'" Id. (quoting Ornelas v. United States, 517 U.S. 690, 699-70 (1996).

Courts have considered the following circumstances relevant to determining whether officers had a reasonable suspicion to detain a suspect: (1) presence in a high crime area; (2) evasive conduct; (3) furtive behavior; and (4) observation by law enforcement of what appears to be criminal activity. See Carl Horn Fourth Circuit Criminal Handbook, § 11 (2013). A suspect's known criminal history may also be a relevant factor. See, e.g., United States v. Sprinkle, 106 F.3d 613 (1997) (holding that an officer could couple knowledge of a suspect's criminal history with more concrete factors to reach a reasonable suspicion of current criminal activity).

Presence in a high crime area alone is not sufficient to find reasonable suspicion. Wardlow, 528 U.S. at 124; United States v. Massenburg, 654 F.3d 480, 486-88 (4th Cir. 2011). Unprovoked flight upon seeing a police officer, standing alone, is not sufficient to find reasonable suspicion. Wardlow, 528 U.S. at 124. However, a combination of these two factors can be a basis for reasonable suspicion that would justify detaining an individual. Id.

Although Smith argues that he was formally arrested when the officers tackled and handcuffed him, the relevant decisional law makes clear that he was not then under arrest. In determining whether a suspect has been formally arrested or merely detained, the standard is an objective one. A suspect is arrested when his "'freedom of action is curtailed to a degree associated with formal arrest.'" Park v. Schiflett, 250 F.3d 843, 850 (4th Cir. 2001) (quoting Berkemer v. McCarty, 468 U.S. 420, 440 (1984). Removing a suspect from a vehicle at gun point and handcuffing him was not an arrest, but was an investigative detention. United States v. Elston, 479 F.3d 314, 319-20 (4th Cir. 2007). When a suspect was placed in a patrol car and handcuffed after police drew their weapons, he was not under arrest. United States v. Leshuk, 65 F.3d 1105, 1109-10 (4th Cir. 1995). Using or threatening to use force does not turn a detention into an arrest. Id. An officer's determination or statement that a suspect was or was not under arrest "has no bearing" on the inquiry. Elston, 479 F.3d at 319.

The factor that pushes a detention over the line to an arrest is one of time and duration, not the use of force or handcuffs. United States v. Sharpe, 470 U.S. 675, 686 (1985). Elston and Leshuk confirm that Smith was not under arrest, notwithstanding that the fact that officers used force to apprehend him and placed him in handcuffs. The entire encounter

10

between Smith and the detectives spanned less than ten minutes, and Smith was only held for approximately three minutes after the chase and while the officers discussed how to deal with the situation and whether to search his bag. This minimal amount of time does not push Smith's detention across the line into a formal arrest. At this point, Smith was detained.

The officers' detention of Smith at this point was based on a reasonable suspicion that he was engaged in criminal activity: the possession of a concealed firearm. The totality of the circumstances known to the officers at the time they detained Smith included that Smith had a criminal record; was in a high crime area; was known to have been involved with firearms in the past; was a recent suspect in two gun-related homicides who, after having given permission for a search of his bag, suddenly fled from the officers; and who, in so doing, had committed a misdemeanor.

Smith claims that his flight was merely a revocation of his consent to search. Whether that is true or not, Smith's flight and evasive behavior can be considered as factors in their reasonable suspicion analysis. See United States v. Darden, 149 F.3d 1171, 1998 U.S. Dist. LEXIS 12728, at *16 (4th Cir. June 16, 1998)(unpublished opinion) (holding that "the officers were entitled to treat [the defendant's] grabbing of his bag from [the officer] and hasty departure as a final straw in a

11

culminating course of conduct"). Smith's "hasty departure," much like the defendant's in Darden, "bespoke a particular concern about revelation of the bag's contents that reasonably could have been seen to provide the final confirmation." Id.[5]

Further, Smith's actions are also much like those of the defendant's in Wardlow wherein the Supreme Court found reasonable suspicion to stop and frisk a suspect who, while in a high crime area, fled upon seeing the police. In Wardlow, police pursued the fleeing suspect, apprehended him, and frisked him and the bag he was carrying. The officer felt what he thought was a gun in the bag, and opened the bag to recover a firearm.

When considered within the totality of the circumstances, Smith's flight was the final factor that gave officers a reasonable and articulable suspicion that criminal activity was

_____

[5] The flights of Darden and Smith differ in one respect: Darden left his bag with officers to be subjected to a dog sniff, and had planned to depart, leaving his address with the officers so they could return the bag to him. After doing this, Darden changed his mind, approached the officer who was going to search his bag, and grabbed the bag from the officer. At this point, the officers decided to detain the bag without Darden's consent. Darden left the scene and was arrested several days later based on the fruits of the search. Smith, on the other hand, after consenting to a search, took his bag with him and fled the scene. Smith's person (along with his bag) was detained minutes later by force. This is a distinction without a difference – the officers in both cases had reasonable suspicion to detain both the person and the bag. Why the officers in Darden allowed the suspect to leave the scene is unclear, but that has no bearing on the outcome of Smith's case.

12

afoot. That reasonable suspicion created the need and authority to detain Smith and further investigate the situation.

## 2. The Search[6]

The Fourth Amendment requires that searches be "reasonable." See <u>United States v. Montoya De Hernandez</u>, 473 U.S. 531 (1985). What is reasonable depends on the circumstances surrounding the search. <u>Id</u>. at 537. In Smith's case, given the circumstances known to the officers at the time of the search, the officers' actions were reasonable and within the bounds of the Fourth Amendment.

---

[6] Smith argues that he was "seized" for Fourth Amendment purposes at this point in the encounter. The Court concludes that he was not, given the decisions in <u>United States v. Drayton</u>, 536 U.S. 194 (2002) and <u>Florida v. Rodriguez</u>, 496 U.S. 1 (1984). In <u>Drayton</u>, the Supreme Court of the United States held that Drayton was not seized when police officers boarded the bus in which he was sitting, stationed one officer at the only door of the bus, and went down the aisle, row by row, asking passengers where they were going and requesting permission to search their luggage and persons. Drayton and his companion consented to searches of their persons (which yielded illegal drugs), and the Court held that these searches were constitutional, and that the defendants were not seized when the officers boarded the bus and began to question passengers. In <u>Rodriguez</u>, the Court reversed a trial court's suppression of evidence obtained when officers in an airport approached a group of men suspected of drug trafficking. The Court held that "[t]he initial contact between the officers and respondent, where they simply asked if he would step aside and talk with them, was clearly the sort of consensual encounter that implicates no Fourth Amendment interest." <u>Rodriguez</u>, 496 U.S. at 5-6. If Drayton and Rodriguez were not seized in spite of their restricted realm of movement inside a bus and an airport, Smith was also not seized when approached outdoors by two officers, even though his back happened to be close to the bus.

Smith takes the view that the search violates what he calls the "frisk first" rule that, according to him, controls searches of the effects belonging to a person detained under Terry. It is true that a number of decisions have upheld the search of a detained defendant's effects because the search was preceded by the "frisk" or "pat down" of the detainee's bag or purse. From those cases, Smith argues that all searches during a Terry stop must be preceded by a "frisk" or a "pat down" of the detainee's property. But, even the decisions on which Smith relies do not establish such a rule.

Moreover, when "frisking first" would be unreasonable under the circumstances of a particular case (as it would have been here), the law does not require officers to act in a way that would endanger their safety and the safety of the general public. Other circuits have held as much in finding that there is no per se rule requiring officers first to frisk an item before searching it for a weapon.

Terry lays out the general rule for the type of search that can be undertaken pursuant to a valid Terry stop:

> Our evaluation of the proper balance that
> has to be struck in this type of case leads
> us to conclude that there must be a narrowly
> drawn authority to permit a reasonable
> search for weapons for the protection of the
> police officer, where he has reason to
> believe that he is dealing with an armed and
> dangerous individual, regardless of whether
> he has probable cause to arrest the

14

individual for a crime. The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger. And in determining whether the officer acted reasonably in such circumstances, due weight must be given, not to his inchoate and unparticularized suspicion or 'hunch,' but to the specific reasonable inferences which he is entitled to draw from the facts in light of his experience.

Id. at 27 (internal citations omitted). The decision's phrasing is significant; even though the Supreme Court was familiar with the phrase "stop and frisk" and understood the basic components of a frisk, see id. at 12, the Court declined to impose an inflexible "frisk first" rule and instead spoke of a "reasonable search for weapons for the protection of the police officer."

In Michigan v. Long, 463 U.S. 1032, 1049 (1983), the Supreme Court held that such a "reasonable search" was not limited to a frisk of the person. In Long, the Supreme Court approved "the search of the passenger compartment of an automobile, limited to those areas in which a weapon may be placed or hidden" when the objective facts provide reasonable suspicion "that the suspect is dangerous and the suspect may gain immediate control of weapons.". This was deemed to be a "legitimate Terry search." Id. at 1050.

In so doing, the Court explained "that suspects may injure police officers or others by virtue of their access to weapons,

15

even though they may not themselves be armed." Id. at 1048. The Court went on to state that: "[o]ur past cases indicate then that protection of police and others can justify protective searches when police have a reasonable belief that the suspect poses a danger . . . and that danger may arise from the possible presence of weapons in the area surrounding a suspect." Id. at 1049. Although Long involved the search of an automobile driven by a Terry stop suspect, the same principles apply with equal force to other items in the area surrounding a suspect in which a weapon might reasonably be expected to be found.

In United States v. Rhind, 289 F.3d 690 (11th Cir. 2002), police officers were informed that the defendants (a group of men suspected in a counterfeiting operation and vehicle theft) were located in a particular hotel room. The officers called the room and told the occupants to leave. When leaving the hotel room, one of the men carried a black, soft-sided, zippered bag. Although the officers did not know the identities of all of the men, they knew that one of them had 15 outstanding warrants and that the group had been riding in a stolen vehicle with stolen license plates. The officers decided to search the black bag carried by one of the men. Finding that the officers had a reasonable suspicion that the defendant was involved in criminal activity and could have been armed, the court of appeals upheld the officers' search of the bag. See also United

16

States v. Thomson, 354 F. 3d 1197 (10th Cir. 2003) (upholding a search of a suspect's bag after patting down the suspect for weapons and obtaining a verbal admission from the suspect that he had a weapon in his bag).

In United States v. Landry, 903 F.2d 334 (5th Cir. 1990), the Fifth Circuit upheld the search of a bag for weapons without a frisk. During a stop of a suspiciously parked vehicle, police spoke to a minor occupant of the vehicle. The minor was asked to exit the vehicle, and the officer saw a large amount of money in the seat. Id. at 337. When the minor was asked about the money, she attempted to re-enter the vehicle and reached for a bag sitting on the seat. Id. The officer feared the bag might contain a weapon, reached for the bag, and saw that it was partially opened. The officer then looked inside the bag and found drugs. Id. The defendant's motion to suppress was denied, and the denial was upheld on appeal. The officer was not required to frisk the bag to determine whether there was a weapon inside. Id. at 338. See also United States v. Brown, 133 F.3d 993 (7th Cir. 1998) (upholding a search of a suspect's bag during a vehicle stop after an officer saw something shiny protruding from the bag).

In United States v. Shranklen, 315 F.3d 959 (8th Cir. 2003), the Eighth Circuit reversed a district court's decision to grant a motion to suppress. Id. at 960. The evidence to be

suppressed included the contents of a black pouch found under the passenger seat of a car stopped in a valid traffic stop. Id. The driver of the vehicle had been issued a citation for driving with a suspended license, and was being detained in the backseat of a police car. Id. The passenger was then ordered out of the car as well, and he asked to retrieve the black pouch from under the passenger seat where he had been sitting. Id. The officer would not let the passenger retrieve the pouch himself, but told the passenger that the officer would get the pouch, search it for weapons, and give it to the passenger. Id. When the officer searched the bag, he found syringes and illegal drugs. The court of appeals upheld the search, holding that, "[a]t any investigative stop – whether there is an arrest, an inventory search, neither, or both – officers may take steps reasonably necessary to protect their personal safety." Id. at 961 (emphasis added). The steps taken by the officers in Shranklen (even though they were searching a bag inside of a car and not a suspect's person) were found to be reasonable under the precedents of Terry and Long. The court held that police searches designed to "protect police and others . . . can be justified in any case 'when police have a reasonable belief that the suspect poses a danger.'" Shranklen, 315 F.3d at 961 (quoting Long, 463 U.S. at 1049) (emphasis added). Wardlow acknowledged the reasonableness of allowing police officers to

18

conduct a protective frisk of a suspect's belongings (in that case, an opaque bag carried by the suspect). <u>Wardlow</u>, 528 U.S. at 122. <u>Wardlow</u> did not, however, establish a "frisk first" rule for searches of a suspect's personal effects.

The best factual analogue for this case, however, is <u>United States v. Walker</u>, 615 F.3d 728 (6th Cir. 2010), a decision which clearly explains why a "frisk first" rule is untenable. In <u>Walker</u>, a police officer encountered a man, Walker, who matched the description of a thief who had robbed a bank less than thirty minutes earlier. When approached, the man confirmed that he was the driver of a nearby van which matched the description of the getaway vehicle.[7] When asked for identification, Walker attempted to access the partially unzipped duffel bag he was carrying. This led the officer to seize the bag, set it on the ground, and move Walker about eight feet away from the bag. Walkerperson was frisked for weapons. The initial officer, together with his backup, then fully unzipped the bag and looked inside, where they mask that was used in the bank robbery. <u>Id.</u> at 730.

The Sixth Circuit noted that "the concern for officer safety extends not only to the suspect himself but to 'the area surrounding the suspect' where he might 'gain immediate control

---

[7] Another suspect, Burke, was encountered in the vicinity of the van and eventually arrested in conjunction with Walker after the search of the bag.

of weapons.'" Id. at 732 (quoting Michigan v. Long, 463 U.S. 1032, 1049 (1983)). Therefore, "[u]nzipping the bag more than it was already unzipped was 'an efficient and expedient way' to determine whether a gun lay on the top of the bag, ready for use." Id. (quoting City of Ontario v. Quon, 130 S.Ct. 2619, 2631 (2010)). The panel went on to highlight the specific undesirability of a hypothetical "frisk first" rule:

> The directive to steer clear of unreasonable searches cannot be reduced to a 'frisk first' or any other one-size-fits-all command, which is presumably why courts of appeals have declined to adopt a 'frisk first' requirement for Terry searches. . .
>
> If it is a loaded gun that concerns the officer, moreover, it is by no means clear that poking a prodding the outside of a duffle bag is the most sensible way to find it. No doubt, the frisking of the outside of a bag intrudes less on the privacy of the suspect. But at what cost? Who looks for a gun by aimlessly grabbing and manipulating the outside of a large bag that may or may not contain the gun – and a loaded gun at that? That, we suspect, is not what gun-safety programs recommend. If Terry permits officers to open a closed container located in a car after a stop and after the officers have removed the passengers from the car, see Long, 463 U.S. at 1050-51, 103 S.Ct. 3469, it surely permits an officer to unzip a duffel bag. . .

Id. at 732-33 (some internal citations omitted).

Finally, the Walker court described the choice the officers on the scene would have faced if, as in this case, they lacked probable cause to arrest the suspect:

> They could make a limited search of the bag
> to ensure their own safety. Or they could
> arrest the suspects and take them into
> custody though it might not yet have been
> clear that probable cause existed that they
> had robbed the bank. Or they could let the
> men go and return the un-searched bag to
> Walker. . . Where, as here, the only
> alternative is to give a suspect access to a
> potential weapon (in an un-searched bag), a
> Terry search for weapons is justified – and
> reasonable.

Id. at 734. The logic of Walker has equal force when applied to
the similar facts in this case.

Smith relies on the decision in United States v. Hernandez-
Mendez, 626 F.3d 203 (4th Cir. 2010), wherein the Fourth Circuit
held that, "[i]f a Terry frisk exceeds the bounds of a
protective pat down for weapons, it is no longer permissible,
and its fruits should be suppressed." Although the cited text
seems, at first glance, to govern the analysis here, it does
not. First, Hernandez-Mendez did not create a rule that frisking
first was always required before a search of a suspect's bag for
weapons. Second, the conclusion that fruits of a frisk that
exceeded the bounds of a protective pat down was given in the
context of distinguishing a protective search for weapons from a
search for evidence. In Hernandez-Mendez, the officer was
reaching for the suspect's purse with the intent to look inside
for identification. The Court of Appeals noted that this search
would have been impermissible. Id. at 212. However, in reaching

21

for the bag, the officer felt the hard outline of a firearm inside the bag, and then opened the bag to find a concealed gun. The inadvertent "frisk" and the subsequent search were objectively justifiable, given the officer's apprehension of impending violent gang retaliation. Id. This was so because the "'purpose of this limited [Terry] search is not to discover evidence of a crime, but to allow the officer to pursue his investigation without fear of violence.'" Id. at 211-12 (quoting Adams v. Williams, 407 U.S. 143, 146 (1972)). In short, Hernandez-Mendez holds that a frisk must be motivated by a reasonable suspicion that weapons are present. It does not hold that the only appropriate response to that reasonable suspicion is a frisk, regardless of the circumstances.

Smith and his bag were detained on a reasonable suspicion that Smith possessed a weapon. This reasonable suspicion authorized the officers to further investigate Smith's person and effects in order to protect their own safety and the safety of the public if Smith was to be released. Smith's unlawful conduct (i.e. running through oncoming traffic) would not have allowed the officers to arrest him. Even if he had been cited for his traffic violations, the officers would have been required to let him go free after issuing a summons.[8]

---

[8] Virginia Code Ann. § 46.2-923 governs how and where pedestrians cross highways clearly prohibits the unlawful traffic conduct of

Given that the officers could not arrest Smith for his unlawful and dangerous conduct, the safest, most reasonable option remaining to the officers was to search Smith and his bag for weapons before releasing him. If Smith had not possessed any illegal items, he would have been issued a citation for his traffic violations and promptly released. However, allowing Smith to reenter the public realm with what the officers suspected was a weapon was neither a reasonable nor prudent course of action.

In Smith's case, as in Hernandez-Mendez, and the other cases cited above, the officers' search of Smith's bag was reasonable under Terry and its progeny because the purpose of the search was to ensure the safety of the officers, the safety of the public, and to "'allow the officer to pursue his investigation without fear of violence.'" Hernandez-Mendez, 626 F.3d at 212 (internal quotations omitted).

The denial of Smith's motion to suppress falls within the bounds of Terry, Long, Wardlow, Walker, and Hernandez-Mendez. Although the officers in Wardlow and Hernandez-Mendez did "frisk

---

Smith. Va. Code Ann. § 6.2-113 provides that, unless otherwise noted, all violations of § 46.2-923 and other laws in that title shall be classified as traffic infractions punishable by a fine. § 19.2-74(A)(2) states that, for persons accused of misdemeanors not punishable by jail sentences, officers "shall . . . issue a summons" and "forthwith release [the suspect] from custody" following the accused's written promise to appear to answer for the charges.

first," those decisions do not establish a requirement that they must always do so. That the officers in Smith's case did not "frisk first" does not make their search unreasonable. In a high crime area that serves as a transit node for weapons and drugs, officers confronted a man who was a suspect in two firearms-related homicides and known to have a history of involvement with firearms. When the officers confronted him in a consensual encounter and asked to search his bag, he first agreed and then suddenly fled. The Court's obligation in deciding this motion to suppress is to determine whether, under the circumstances that faced the officers at the time they acted, the search of Smith's bag for weapons was reasonable to ensure the safety of the officers and the public. It was.[9]

Even if Terry did establish a de facto "frisk first" rule for searches of a person and immediate clothing (which it did not), the circuit cases discussed above all involved searches of bags or pouches. This distinction is significant, because while a protective pat down of a person is almost sure to detect any solid object which might be a weapon, a bag or pouch can conceal a weapon from a cursory external search. Cf. Walker, 615 F.3d at 732-33. The analysis of whether a given Terry search was reasonable requires a different balancing of factors when a

---

[9] With this resolution, it is not necessary to address the consent issue.

24

closed container is within the possession or control of the suspect."The court's job is to ask what was reasonable under the circumstances, not to poke and prod for lesser-included options that might not occur to even the most reasonable and seasoned officer in the immediacy of a dangerous encounter." <u>Walker</u>, 615 F.3d at 732.

**CONCLUSION**

For the foregoing reasons, the defendant's MOTION TO SUPPRESS EVIDENCE (Docket No. 15) will be denied.

It is so ORDERED.

_____ /s/ _RЄГ_

Robert E. Payne
Senior United States District Judge

Richmond, Virginia
Date: December 30, 2013